Cynthia DUNCAN, Plaintiff,

v.

MANAGER, DEPARTMENT OF SAFETY, CITY AND COUNTY OF DENVER, and David Michaud, individually, Defendants.

No. CIV.A. 99–M–1299.

United States District Court, D. Colorado.

May 8, 2003.

*Id.*

Patrick Francis Carrigan, Faegre & Benson, LLP-Boulder Colorado, Boulder, CO, David Joel Dansky, Chambers Dansky & Mulvahill, Denver, Co, Leslie C. Hansen, Leslie C. Hansen, P.C., Denver, CO, for Cynthia Duncan.

Charles L. Casteel, Janet Savage, Davis, Graham & Stubbs, Denver, CO, Daniel E. Friesen, Hale Friesen, LLP, Denver, CO, Terrance R. Kelly, James E. Hubbell, Kelly/Haglund/Garnsey & Kahn LLC, Fenver, CO, for Denver Dept. of Safety Manager.

## ORDERS ON MOTIONS FOR SUMMARY JUDGMENT

MATSCH, District Judge.

Cynthia Duncan began her employment with the Denver Police Department ("DPD") in 1979. Her first assignment after graduating from the Denver Police Academy was in District 4 where she served until 1984 when she transferred to District 1. In 1988, she became a detective and was assigned to the Crimes Against Property Department within the Detective Bureau. She transferred to the Crimes Against Persons Department in a career development move in 1991 where she served until July, 1995, when she moved to the Internal Affairs Bureau. Ms. Duncan was promoted to Sergeant. Following normal practice, that promotion required that she be reassigned to street duties and she went back to District 4.

On April 14, 1998, Ms. Duncan filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). In that charge, she made the following allegations:

I. PERSONAL HARM: During the course of my employment as a Police Officer, I have been subjected to sexual harassment, retaliation and different terms and conditions of employment.

II. RESPONDENT'S DEFENSE: Despite my complaints to my superiors and the Department of Internal Affairs, no effective action has been taken.

III. DISCRIMINATION STATEMENT: I believe that I have been discriminated against because of my gender, female, and in retaliation for my having complained of discrimination, inasmuch as:

a. My co-workers circulated sexual gossip about me and made sex innuendos about my having affairs with several superiors.

b. An anonymous letter with sexual references about me was sent to the home of one of my co-workers, with threats of sending one to my house, stating that receipt of the letter will cause my husband to kill me.

c. I was placed under surveillance by one of my co-workers.

d. My supervisor told me that I would have to submit a picture of my bruised buttocks, if I wanted to file a complaint of physical assault against my co-worker.

e. Derogatory names were used by one of my supervisors in refer female anatomy.

f. One of my supervisors has a history of using derogatory comments about women, as does one of my peers.

g. Other female officers are also harassed.

h. The harassment is pervasive and department-wide and represents a continuing pattern of harassment.

Ms. Duncan was transferred to the DPD Training Academy in August, 1999, and in December, 1999, she was transferred to Traffic Operations in the Photo Radar Unit. Ms. Duncan went on medical leave in June, 2000,[1] and filed the complaint in this

---

1. These dates were obtained from pages 2–3 of the plaintiff's response brief. Ms. Duncan testified, however, that she went on medical leave in June *1999* after she complained about an officer while she was in traffic. (Duncan Depo., pp. 840, II. 23 to 842 II. 20.) She testified that she went to traffic in December

lawsuit on July 8, 1999. Ms. Duncan was given a disability retirement in the summer of 2000.

The defendants filed motions for summary judgment which have been fully briefed with the submission of deposition testimony and exhibits. Oral argument was heard. There are many disputes concerning the facts. Accordingly, all of the proposed evidence must be considered in the light most favorable to the plaintiff without making credibility determinations on disputed testimony.

The City contends that the Title VII claims should be dismissed because they are barred by the time limitation requiring that the administrative charges must be filed no later than 300 days following discriminatory or retaliatory conduct. Accordingly, it is argued that the court should consider only conduct occurring on or after June 18, 1997. Both defendants argue that the claims under 42 U.S.C. § 1983 are barred by the two-year statute of limitations. Additionally, both defendants contend that the plaintiff's proffered evidence is not sufficient for a reasonable jury to find liability against either of them for gender discrimination based on a hostile work environment or for retaliation for complaints because the complained of conduct was not sufficiently severe and pervasive to affect Ms. Duncan's terms and conditions of employment and because no causal connection has been shown between her complaints and any subsequent adverse employment action.

The time limitations under Title VII must be considered under the continuing violation doctrine announced by the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

■ In that case, the Court recognized a difference between discrete discriminatory and retaliatory acts and a hostile work environment claim, holding that because a hostile work environment requires proof of repeated discriminatory conduct, the claim is not necessarily barred by the statutory time limitations. More specifically, the court held that:

A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.

*Id.* at 122, 122 S.Ct. 2061.

In applying that ruling, this court must analyze the proposed evidence to determine whether the plaintiff can establish the essential elements of a hostile work environment claim as developed by the opinions deciding *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ As Justice Thomas wrote in *Morgan*, the statutory language of Title VII prohibits discriminatory employment practices and a hostile sexual work environment becomes a discriminatory practice as a result of "the cumulative [e]ffect of individual acts." *Morgan* at 115, 122 S.Ct. 2061. In *Harris*, the Court repeated the operative language from *Meritor* that Title VII is violated when the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

1998. (Duncan Depo., p. 50, ll. 11–15.) Further, Ms. Duncan's counsel stated during oral argument that Ms. Duncan was transferred from District 4 to the Academy in the summer of *1998*.

abusive working environment." *Harris* at 21, 114 S.Ct. 367 (internal quotation marks omitted). The statute of limitations defense and the viability of the plaintiff's Title VII claim in this case depend upon a detailed factual analysis. The Tenth Circuit Court of Appeals opinion in *Gross v. Burggraf Const. Co.*, 53 F.3d 1531 (10th Cir.1995) is helpful as guidance.

In her response brief, the plaintiff has listed 58 events claimed to be acts of gender harassment with references to evidentiary support for them. These allegations are grouped according to Ms. Duncan's years of service in her departmental assignments. The City's briefs respond to these allegations with references to the evidentiary record regarding DPD's responses to the complaints made by the plaintiff during her career. A chart summarizing these submissions, attached as Appendix A, demonstrates that the plaintiff is unable to connect these events into a timely, actionable discriminatory employment practice.[2]

The most significant conduct occurred during Ms. Duncan's first assignment to Division 4. Her descriptions of the conduct of a Captain and co-workers could be considered to be of sufficient severity, frequency and hostility as to be actionable as a discriminatory work environment. There was no continuing pattern of the same types of events when she was in District 1 and she advanced her career by becoming a detective and received a promotion to sergeant.

■ The events occurring after 1984 are sporadic and disconnected with the exception of the rumors concerning improper relationships between the plaintiff and command officers. Rumors of heterosexual intimacy will not ordinarily be considered gender discrimination because both men and women are victimized. The argument here is that such rumors disadvantage women in the workplace when the implication is that the only way women can advance their careers is by granting sexual favors to the men empowered to make promotion decisions. The clearest evidence of rumors about Ms. Duncan and her superior officers are two anonymous letters, one addressed to the Mayor. Read in full context, those messages are political attacks on the leadership of the DPD and their abuse of authority in which their conduct with Ms. Duncan is but an example.

The truth or falsity of these rumors of impropriety cannot be determined on this record. The plaintiff has admitted frequent telephone calls, luncheon engagements and other contacts which could easily be interpreted as indications of romantic relationships. When there is a factual basis for a reasonable inference of impropriety as a result of a woman's voluntary conduct, it would not be reasonable to find that other workers' comments and suggestions about such a relationship were motivated by gender discrimination or a hostility toward women in the workplace. Moreover, there is no showing that these persistent rumors caused any

---

**2.** In addition, there were at least two other IAB investigations of events which were not included in Ms. Duncan's listed events. First, she initiated a complaint against an officer for remarks about a new rumor about her, made while he was off duty installing blinds for a civilian, a retired detective. IAB investigated and concluded any violation was unfounded because it was a private conversation between an off-duty officer and a recently retired officer. (9/29/99 IAB letter, City's Exhibit N.) Second, there was an IAB investigation of a lieutenant for a statement made to the effect that if this was Vietnam, Ms. Duncan would be "fragged" by now. IAB found the allegation against the lieutenant "not sustained." (10/20/98 IAB letter, City's Exhibit M.)

adverse employment decisions or altered the terms and conditions of the plaintiff's employment. The rumors were about her special relationship with the men who had authority to advance her career and there is nothing to suggest that they were influenced negatively against the plaintiff. Notably, Heather Coogan testified that she too was subject to similar rumors during her long career with the DPD and she rose to the rank of Deputy Chief of Police, second in command of the department.

Ms. Duncan suggests that she did not advance to lieutenant because of some possible bias against her by unnamed persons but her evidence is wholly speculative on this point.

 As the events complained of do not constitute one unlawful employment practice under *Morgan,* those events which occurred before June 18, 1997 are untimely. Because Ms. Duncan grouped the events into blocks consisting of several years, based on the record provided, she has only established a few listed events after June 18, 1997, none of which is actionable. For example, as previously discussed, the rumors about her and command officers were gender neutral. Further, the sergeant who made remarks about her at the Breakfast King Restaurant was investigated and disciplined and the subordinate officer who made the crude remark in June, 1999 was reprimanded.

The DPD had a policy prohibiting sexual harassment and an enforcement procedure for complaints. Ms. Duncan made informal complaints to supervisors and filed formal complaints with the Internal Affairs Bureau ("IAB"). Except for the first event listed by Ms. Duncan, each of the IAB complaints was investigated and disciplinary action was taken against proven offenders. The plaintiff complains that some investigations were inadequate. Illustratively, she says that her complaint against another officer for slapping her buttock was not investigated when she refused to permit photographing the bruises because she did not want the files to include such a picture. Photographing a physical injury is a standard procedure and Ms. Duncan's refusal prevented the IAB from obtaining corroborating evidence of the alleged conduct. That was not an unreasonable response. The plaintiff has failed to demonstrate that the disciplinary actions taken were not effective to prevent reoccurrences of misconduct by the offenders.

The plaintiff asserts that the City failed to provide adequate training to prevent violation of its policy. The evidence does not support that claim.

The City is not liable for the sporadic and individual workers' offensive misconduct under *Faragher, supra* and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

The plaintiff does not have a viable claim for a Fourteenth Amendment denial of equal protection against the City for the same reasons that defeat her Title VII claims, although, based on the two-year statute of limitations, only incidents on or after July 8, 1997 are timely.

 In the *Morgan* opinion, the Court ruled that the defendant employer in a hostile sexual harassment case may raise the equitable defenses of laches, waiver and estoppel. As shown in Appendix A, Ms. Duncan does not remember many of the specifics of the events complained about over nearly twenty years of her employment. The City is unable to obtain evidence to rebut or contradict the plaintiff's testimony when she is unable to be specific about time, places and persons present. Some of the officers are now unavailable. It would be inequitable to present Ms. Duncan's accounts of these events to a jury when the defendant can-

not produce evidence to challenge her testimony when that inability results from Ms. Duncan's unreasonable delay in filing her EEOC charges and this civil action.

■ David Michaud seeks dismissal of the Fourteenth Amendment claim against him on the same grounds as the City and on the additional claim that he is entitled to qualified immunity. The essential element of the case against Mr. Michaud is that during his tenure as Chief of Police he failed to take effective action to prevent the sexual harassment of Ms. Duncan and other women officers. The findings concerning the adequacy of the City's policy, as summarized in Appendix A, defeat that claim. The proffered evidence is insufficient to establish that David Michaud di-

rectly discriminated against Ms. Duncan or took any retaliatory action against her. Mr. Michaud's alleged actions regarding the rumors were gender neutral and directed to dispelling the rumors, only one of which involved Ms. Duncan. His action in transferring Ms. Duncan, with the concurrence of Deputy Chief Heather Coogan, to the Academy was for her safety and Ms. Duncan testified the only vacant position there at the time was a technician spot. Upon the foregoing, it is

ORDERED that the City's Motion for Summary Judgment and David Michaud's Motion for Summary Judgment are granted. The clerk will enter a judgment dismissing the plaintiff's claims against both defendants with an award of costs to the defendants.

## APPENDIX A
### CHART SUMMARIZING THE PLAINTIFF'S ALLEGATIONS OF HARASSING EVENTS
*Duncan v. Manager, Dept. of Safety et al.*
Civil Action No. 99M1299

| No. | Assignment | Allegations of Harassing Events | Paraphrased Testimony and Exhibits | Complaints and Responses | Comment |
|---|---|---|---|---|---|
| 1 | District Four (1979–1984) | "Duncan was sexually assaulted by a male police officer in a police department parking lot." | While still assigned a training officer ("TO") and working late, she walked out the back door and went to her car. A large officer who was hiding in the back of the building came at her, started touching her, pulling on her clothes, pushing her to him. She was scared and finally got to her car. | She told her TO the next day, they went down to Internal Affairs and "I was basically told to shut up." | No date given. Assignment with a TO was at the beginning of her employment. |
| 2 | District Four (1979–1984) | "Duncan received letters in her police department mail box indicating the author was going to rape her, kill her, cut up her body and scatter the pieces around the city." | Anonymous letters from within the department were put in her locker about how they were going to do despicable acts to her, then cut up her body and throw the parts over Denver. They were triggered by hatred for police women. It was believed there were two different authors of two different letters. One of the authors was discovered and fired. No one else was found. | Based on Duncan's testimony, there was an investigation about the letters she was receiving. They found one of the authors and fired him. (No testimony cited on who initiated investigation.) | No date given. Response appears to have been reasonable. |
| 3 | District Four (1979–1984) | "Police officers, with whom Duncan was partnered, groped her while on duty by | "You would get in your police car, a policeman would have his hand down on the seat, when you sit down, he | Duncan did not report and it was not the subject of an IAB | No dates given. One officer was fired. The oth- |

| | | | | | |
|---|---|---|---|---|---|
| | | placing their hands, palm up, in her car seat so that she would sit on the open hand." | would play with your rear end."<br><br>The plaintiff named two officers. One was fired. The other one stopped when she told him to stop.<br><br>Those were the only times that happened to her. It was attempted many more times but she was smart enough so they would not get away with it.<br><br>". . .it happened with other people. It is endless. I can't remember everybody. It was a long time ago."<br><br>She "was brand new" at the time. | investigation. It is not clear why one officer was fired. | er officer who ceased his conduct is the same officer who was fired in No. 2. |
| 4 | District Four (1979–1984) | "A fellow officer deliberately exposed his penis to Duncan, making the comment 'isn't this nice'." | In 1983 an officer pulled his penis out of his pants; she told him it was inappropriate; it made him mad; he started to tell people she had sex with him all the time. | No indication this was reported. | This occurred when they were going to have a choir practice, some people went for more beer, she and the officer were waiting for other people to come. This does not appear to have occurred while the plaintiff was working. |
| 5 | District Four (1979–1984) | "Talk by male police officers about their sex lives was routine." | Every male officer she worked with would tell her about how his wife did not understand him and he slept on the couch; setting her up for a sexual rendezvous.<br><br>Almost all of them did; she did not recall any names.<br><br>She did not even "log it"; did not even take note of it because it was so common.<br><br>This happened in District Four, early years ('79–'84), because she worked solo in District One. | No indication this was reported. | This is too indefinite to constitute hostile and abusive conduct. |
| 6 | District Four (1979–1984) | "Regular insinuations and comments about Duncan's sex life." | Her TO, who was married but involved with a restaurant manager, "made some remark that me and him were involved sexually." She said at roll call that was interesting "because I don't ever remember it." That took care of the problem.<br><br>An officer she worked with had a roommate who said, in front of others, that he found a bra in his bed and assumed | No indication this was reported. | No date given.<br><br>Only two comments were cited.<br><br>The officer she worked with is the same one mentioned in No. 13 & No. 16. |

| | | | | | |
|---|---|---|---|---|---|
| | | | it was Duncan's. She gave him a smart remark back that embarrassed him and they traded barbs for the next year. After that, "actually, we got along pretty well." | | This is duplicative of No. 16. |
| 7 | District Four (1979–1984) | "Accused of having sex with a sergeant on the captain's desk." | Does not know who made accusation. Occurred "throughout" the time when she was first in District Four. | No IAB complaint made. | This is duplicative of No. 18. |
| 8 | District Four (1979–1984) | "An officer with whom Duncan was partnered called a radio station frequently listened to by police officers and asked a DJ to relay a [sexually suggestive] message to Duncan on the air while they were riding together." ". . Duncan had reason to believe that other police officers heard the radio announcement." | The officer was married and called a country music station and had his girlfriend announced "To Cindy out there, your partner just wants you to know that he thinks you are wonderful, and some other crap, and some sexual thing." "That he thinks you are beautiful" and "wants to do it with you." "She [his girlfriend] is laughing." ". . . all policemen are listening to the same country music station." She was a "boot" then. Boots were treated like dirt. | No indication this was reported. | No date given. This is the same officer who was fired in No. 3. |
| 9 | District Four (1979–1984) | "Duncan's commanding officer [a captain] asked a sergeant who recommended her for a promotion if Duncan was 'giving him head'. [He] asked if Duncan was giving all the sergeants 'head' when they concurred in the recommendation. Duncan did not get the promotion." | The captain asked the sergeant if Duncan was giving him "head" when he recommended her to be a TO. She "doesn't know the context . . . because [she] only got it second-hand. . . ." She asked the sergeant what if all of the sergeants went and told the captain that they believed she would be a good TO. "So I was of the impression that he had gone to talk to [the captain], and that basically [the captain] said, Does she give you all head or what?" She was never allowed the opportunity to be a TO because the class came and went. | No indication this was reported. | This remark was not made to her or in her presence. |
| 10 | District Four (1979–1984) | "Capt. —— was generally hostile to females under his command, made remarks about Duncan's breasts, and covered her calls on the street to check up on her when he did not do the same for male officers under his command." | She can only speak for herself regarding what the captain did that she felt was harassment. He made remarks about her breasts. He did not like police women. He "would always seem to cover my calls." "This mean[t] that sometimes he would get there before I did, which is highly unusual." It was a way of intimidating her, you always have to have your hat | No indication this was reported. | No dates given. This is highly speculative as to an improper motive. |

on, do everything perfect.

She was not new then, no longer a recruit. Does not know whether he covered recruits' calls.

She surmised that he did not do this to male officers when a male officer asked her whether the captain always covered her calls.

| No. | Location (Date) | Allegation | Response | Reported | Notes |
|---|---|---|---|---|---|
| 11 | District Four (1979–1984) | "Officer ——, who believed women did not belong on the job, got on the police radio and announced on the air that he would not cover Duncan when she got called to a bar fight and was working solo." | The officer was at her level. He did not believe women belonged on the job. He got on the air and said he would refuse to cover me when they sent me to a bar fight solo.<br><br>He is dead now. | No indication this was reported. | No date given for the incident or the officer's death. |
| 12 | District Four (1979–1984) | "A dildo was put in the mailbox of another female police officer, Officer ——." | District Four.<br><br>A male officer showed Duncan the dildo and told her how much fun he was going to have tormenting people with it. He apparently put the dildo in the mailbox. The female officer believed that the male officer did it but accused Duncan because she thought Duncan was involved and Duncan was a clerk. | No indication this was reported. | The male officer is the same man who was fired in No. 2. |
| 13 | District Four (1979–1984) | "Comments and/or allegations that Duncan was having sexual relationships with her [male] partners, —— and ——." | She was accused of having an affair "with anyone I had as a partner." When asked to give a list, Duncan identified ——, a detective in the theft bureau ('89–'91), —— in '81 or '82, and —— in '83. | No indication this was reported. | One officer is the same one mentioned in No. 6 & No. 16. |
| 14 | District Four (1979–1984) | "While on a burglary call in a dark basement, a fellow patrol officer put his arms around Duncan and kissed her." | District Four. She named the officer. He put his arms around her and kissed her on the face. He laughed and said it was no big deal. "And we worked that out." "It was wrong, and I didn't appreciate it, and it didn't happen anymore. He just had to be told." | No indication this was reported. | This was an effective self-help remedy. |
| 15 | District Four (1979–1984) | "Another female officer was referred to as a 'split tail' over the police radio." | The woman referred to as a split tail told Duncan that she "reported it."<br><br>She does not remember if this was in District Four or One. | According to Duncan's testimony, this was "reported" by the female officer. | Duncan does not remember if this was in District Four or One.<br><br>There is no information about a response. |
| 16 | District Four (1979–1984) | "Duncan's partner's roommate (also a police officer) com- | The pages cited do not support this allegation. If the plaintiff was referring to | No indication this was reported. | No date given.<br><br>This is duplica- |

| | | | | | |
|---|---|---|---|---|---|
| | | mented that he had found a bra in his bed and assumed it was hers, implying that she was having a sexual relationship with her partner ——." | pages 238–239, this reference is duplicative of No. 6 above. | | tive of No. 6.<br><br>The same officer is mentioned in No. 6 & No. 13. |
| 17 | District Four (1979–1984) | "A particular lieutenant would call females in after dark because he did not want policewomen on the street at night." | It was the lieutenant for whom she worked.<br><br>"You don't report these things. Nobody thought them to be a problem or a crime. It is just what they did." | Not reported. | No date given.<br><br>The cited testimony does not support the allegation that this is sexual harassment. It appears to be a protective measure. |
| 18 | District Four (1979–1984) | "Was accused of having sex with a sergeant on the captain's desk." | This is duplicative of No. 7. | No IAB complaint made. | This is duplicative of No. 7. |
| 19 | District Four (1979–1984) | "Duncan was forced to ask for a transfer from District 4 to District 1 in mid-period because of the harassment of [the captain in District 4]." | Duncan called the captain in 1 about moving to 1 mid-period, because of harassment by the captain in 4. | No indication this was reported other than to the captain in 1. | No date given. Presumably this was at or near the time of transfer. The remedy requested was granted. |
| 20 | District One (1984–1988) | "Throughout her tenure at District 1, Duncan was ostracized by fellow officers and did not receive cover from fellow officers." | District One.<br><br>"...when I got the next car up, it caused a lot of resentment with the men in that sector. They wouldn't take me to coffee, they wouldn't cover my calls." "I basically worked a solo car ..."<br><br>The supervisor put me on the car instead of taking a vote to see whom they wanted, which would have been another officer, so they ostracized me. "They didn't want a woman there." I got along fine without them. I was used to working solo. "That was what I wanted, because I didn't want to have a full-time partner."<br><br>"I had a lot of friends who would cover me and go to lunch."<br><br>"I had to operate in not as safe a level of police work simply because I didn't have backing."<br><br>"I never asked for cover."<br><br>That entire sector would not cover her. "Unless I abso- | No indication this was reported. | Duncan's testimony is inconsistent; she said she was ostracized and did not receive cover, and then said she had friends who would cover her. |

lutely called it out and said I had to have cover."

| # | Assignment | Allegation | Testimony | Reporting | Conclusion |
|---|---|---|---|---|---|
| 21 | District One (1984–1988) | "A detective walked into a closet behind Duncan, put arms around her, pushed her against the shelves and tried to kiss her on the mouth." | District One. A named detective followed her into a closet, "put his arms like that," "put me up against he shelves," and tried to kiss me. | No IAB complaint was made. | This was an isolated incident. |
| 22 | District One (1984–1988) | "She was … more often assigned to be the clerk for her shift than male officers." | District One. The supervisor "was known not to like women." "On numerous occasions," she would be in a car and then be clerk. "[I]t started to be a pattern …." "[T]hey put me on a scout car and I got moved off that." | No indication this was reported. | The testimony does not support the allegation that she was assigned more than male officers. In some respects, it is inconsistent with her testimony in No. 20, where she says that the same supervisor gave her the next car up, which caused her to be ostracized. |
| 23 | Detectives/ Crimes Against Property (1988–1991) | "Comments and/or allegations that Duncan was having sexual relationships with two fellow detectives, —— and ——." | In the theft bureau there were rumors she was having an affair with a named detective. '89–'91 time frame. | No IAB complaint was made. | The cited testimony does not support the allegation concerning the other detective. |
| 24 | Detectives/ Crimes Against Property (1988–1991) | "While working one Sunday, a detective grabbed Duncan and tried to kiss her on the mouth." | Although the plaintiff referenced pages 275–275, it is assumed she meant pages 275–276. One Sunday a detective grabbed her body and kissed her. She does not know if it was on her mouth. He is now retired. The theft bureau. | She did not report it. | This is an isolated incident. |
| 25 | Detectives/ Crimes Against Property (1988–1991) | "2–3 suggestive notes left on her desk by a fellow detective." | She was in the theft bureau. A named detective left two or three notes on her desk saying he would like to go out with her, "I would like this, I would like that." She confronted him about it and asked him not to do that. | No IAB complaint made. | There is no indication that he repeated this conduct after her request to stop. |
| 26 | Detectives/ Crimes Against Property (1988–1991) | "Duncan asked for an assignment in burglaries and was requested for the assignment by a sergeant, the lieutenant assigned to burglaries refused to allow her to transfer into the unit because she was a woman." | A sergeant, now retired in Florida, wanted her to work for him. He told Duncan that the lieutenant said he would not allow Duncan to transfer into burglaries because she was a woman. She was in theft; in '91. The lieutenant is dead. | No indication this was reported. | There is no indication that this was an adverse employment action. |

| | | | | | |
|---|---|---|---|---|---|
| 27 | Detective/ Crimes Against Persons (1991–1995) | "Regular remarks by a lieutenant of a sexually suggestive nature and unwanted physical contact by him." | She was in the assault bureau.<br><br>The named lieutenant made remarks such as "You look so nice today." "What are you doing tonight? Do you want to have a drink?" "He would get close to you, brush up against you in the elevators." She got irritated at him, said something. That day or the next day he apologized and said he had been out of line and did not know she was married. | No indication this was reported. | The offensive conduct stopped when she spoke to him. This was effective self-help. |
| 28 | Detective/ Crimes Against Persons (1991–1995) | "Suggestive comments by her commanding officer, that aside from her abilities, Duncan 'brought a lot to the table' and other inappropriate remarks by the same commanding officer." | A named captain asked Duncan if she could get him a date with Duncan's girlfriend.<br><br>She was under his command at the assault bureau.<br><br>When she was going to do the sergeants test the captain said "It is not just your abilities, as a police officer, that would make you such a good sergeant, because you really do bring a lot to the table." "And to me that was full of quite a bit of innuendo." "I assumed … it meant … my personal physical appearance." "[H]e was sitting very close to me, and he leaned over, and he said it." | No indication this was reported.<br><br><br><br>She did not report this incident. | These remarks do not appear to be hostile or abusive. |
| 29 | Detective/ Crimes Against Persons (1991–1995) | "Hit on the buttocks by an officer so hard that it left a bruise." | She tapped an officer on the top of his left shoulder to ask him to stand and allow her to pass. He said "Now, what would you do if I touched you on your backside like that?" And she said that "I guess similar circumstances, yeah, you could do the same thing." Then he slapped her on her rear end. She could not sit; it was very painful. "It was really kind of red." Her girlfriend saw it. | IAB Complaint filed, Duncan would not allow pictures of the alleged bruise to be taken, no independent source to support complaint so complaint could not be sustained. No disciplinary action taken but complaint made part of the file on the accused officer. (Letter to Duncan dated 12/28/93, City's Exhibit D.)<br><br>The officer did not engage in similar conduct again. | The refusal to cooperate in the investigation ended it. A photograph was a routine procedure. |
| 30 | Detective/ Crimes Against Persons (1991–1995) | "Accused of having sex with Dep. Chief —— on his desk." | She was on medical leave from an accident when the Deputy Chief was discovered in a sex act at headquarters with a woman. Her girl- | No indication this was reported. | This could not be considered a hostile or abusive act. |

| | | | friend called Duncan and told her that "People are saying that it might even be you by the way they described her." | | |
|---|---|---|---|---|---|
| 31 | Detective/ Crimes Against Persons (1991–1995) | "Was pressured by a superior officer to get him a date with a woman Duncan knew." | This duplicates No. 28.<br><br>The captain "pushed it a number of times: Did you ever contact your girlfriend?" | No indication this was reported. | This is partly duplicative of No. 28 and could not be considered abusive or hostile. |
| 32 | Detective/ Crimes Against Persons (1991–1995) | "A superior officer told her 'she owed him' after he supposedly did her a favor." | The "she owed him" was a favor he wanted from Duncan, namely, to get him a date with her girlfriend. | No indication this was reported. | This is partly duplicative of No. 28 and No. 31. |
| 33 | Internal Affairs (1995–1996) | "An officer who came into a unit to see another detective remarked to Duncan as she wrapped a valentine's gift for her husband, "I understand your valentine's list is longer than your Christmas list." | A detective said this. She was wrapping presents, ties, for her husband and her father. | No indication this was reported. | This could not be considered hostile or abusive. |
| 34 | Internal Affairs (1995–1996) | "Allegations by officers manning the front desk that they saw [a superior] touching Duncan's breasts through the cameras on the outside of the headquarters building." | "[T]he guys in the info desk said they caught [a superior] touching my breasts, okay? That was a new rumor that got started. That never occurred." "I don't remember" who told me that's what was being said. | No indication this was reported. | This is an isolated incident. |
| 35 | Internal Affairs (1995–1996) | "Chief Michaud caused her ranking on the sergeant's promotion list to be lowered." | Referenced pages (pp. 957–958) were not provided by the plaintiff.<br><br>Plaintiff's Exhibit 26 is a letter dated 4/5/96 from Michaud to the Civil Service Commission outlining the events which led up to Duncan's change in ranks with another female officer, moving Duncan up to number 27 from 28, stating he believed the change to move her up from her original rank was inappropriate, and requesting that the Sergeant's Eligibility Register be revised and returned to its original rank order. | No indication this was reported. | There is nothing to indicate that this was done with a discriminatory intent or a hostile reason. It did not affect Duncan's promotion to sergeant. |
| 36 | Internal Affairs (1995–1996) | "Duncan was not allowed to use a department vehicle when she was the on-call detective unless she made a formal written request to do so, whereas the male detectives were allowed to use | She was in internal affairs. She was brand new. The other two detectives were veterans.<br><br>She was treated "differently than the other two detectives." "When the detectives who were supposed to be on call with the car, when | No indication this was reported. | The cited deposition testimony does not support the allegation that she was treated differently because she was a woman. Instead, she testi- |

| | | | | |
|---|---|---|---|---|
| | the car at their own discretion." | they had the car, they didn't have to ask to have the car between this month and this month ... but ... [when] it was my time, I had to make a formal letter and request it." | | fies that she was *brand new* and the *veteran* detectives received more favorable treatment. |
| 37 | Internal Affairs (1995–1996) | "Duncan's sergeant monitored her comings and goings in the unit and did not monitor the male detectives." | The same cited deposition testimony is used to support No. 36 & No. 37.<br><br>She was brand new in internal affairs.<br><br>The supervisor monitored her activity and treated her differently "than the other two detectives." For example, "He let both detectives in IA go away at that time when we had a lot of hearings and everything else. I was brand-new. I had been up there maybe two weeks. He let both of the veteran detectives go . . . ." | No indication this was reported. | Again, the tone and content of the testimony supports the conclusion that she was treated differently because she was new. She did not state that she was treated differently because she was a woman. (See No. 36.) |
| 38 | District Four (1996–2000) | "Allegations circulated that another sergeant was transferred from District 4 to make room for Duncan implying that because she was having an affair with [a chief] she got to choose where she wanted to go." | Hines testified that comments about Duncan were called "Cindygate." That she was having an affair with the chief and that's the reason why she was transferred to District 4 out of IAB. ". . . it was a forced transfer with Sergeant Pinder to IAB, because Sergeant Duncan came out on the street when she made sergeant." | Duncan initiated an IAB complaint about rumors circulating and an investigation was conducted. No violation was found. (See No. 55.) | No date given. Although unclear, presumably this occurred when Duncan transferred to District 4. |
| 39 | District Four (1996–2000) | "After Duncan was assigned to District 4 and before she started her assignment, allegations circulated that she was having affairs with command officers and would be able to work any detail she chose." | According to Hines, before Duncan was assigned out at District 4, there were comments about her relationship with Leary, Michaud, and Sanchez. As to Sanchez, there were comments that Duncan received special treatment and promotions and transfers that other people had not received.<br><br>Duncan testified: "He thought that Andrews should stay on the morning shift, and he would move me to day shift" so that he could monitor the situation because he worked days and could make sure her environment was better. She asked him not to because "it will just be more special treatment."<br><br>He said that, before she came out, Lt. Leone asked him not to bring Duncan "here" because "She's a pipeline to the administration because she's friends | See No. 55 discussing Duncan's IAB complaint and its investigation.<br><br>See IAB complaint against Leone referenced in No. 42. | Hines' testimony related to *before* Duncan was assigned out at District 4.<br><br>The cited deposition testimony does not identify who "he" is.<br><br>The rumors were not discriminatory because they affected male supervisors |

| | | | | | |
|---|---|---|---|---|---|
| | | with them. She will tell them everything she don't like that goes on here, and I'll bet you within three months, she'll be voting any days she wants and working days." | | | unfavorably as well as Duncan. |
| 40 | District Four (1996–2000) | "Duncan was the subject of two anonymous letters circulated throughout the department, which alleged, among other things, that Duncan received choice assignments because of her relationship with Sanchez." | Sanchez testified: Exhibits 37 & 38 were two anonymous letters that floated around more than department wide. [He has seen several other anonymous letters concerning Duncan. There was a letter that referred to "Cindygate" and "concubine," and alleged a sexual relationship between Duncan and Leary. This was sometime between 1995–1998. Michaud was concerned with Duncan's personal safety.]<br><br>Exhibits 6 & 7 are the alleged anonymous letters: Exhibit 6 contains the date May 23, 1997, so the letter must have been written after that date. Duncan is a small part of the letter that is addressed to "Dear Mr. Mayor." Although Duncan is one of many names in the letter, it is an attack on the "corrupt police administration" and not directed at Duncan.<br><br>Exhibit 7 contains a few dates, the most recent is March 1999. It also references Duncan's transfer to the academy and then to the photo radar unit. Although the bulk of the letter addresses Sanchez's relationship with Duncan, it is directed toward Sanchez and his alleged improper relationships and abuse of authority. | See No. 55 discussing Duncan's IAB complaint and its investigation. | These criticisms were of the management of the DPD and could not reasonably be considered hostile or abusive of Duncan. |
| 41 | District Four (1996–2000) | "Duncan was the subject of another anonymous letter, which accused her of having an affair with Dep. Chief Leary. The author threatened to send a similar letter to Duncan's home in an effort to get Duncan's husband to get a gun and shoot them both." | There were other letters in addition to Exhibits 37 & 38 (plaintiff's Exhibits 6 & 7). There was a letter that said they were going to send one to her house, in hopes that her husband, a cop, would get a gun and kill her and Leary. The Chief was concerned about it. This was prior to Exhibits 37 & 38. | See No. 55 discussing Duncan's IAB complaint and its investigation. | The reference to a threat to Duncan and Leary is an isolated event. |
| 42 | District Four (1996–2000) | "Lt. Leone told other officers he was going to follow Sgt. Duncan and the | "I heard sergeants in the sergeants' office talk about how Leon[e] had bragged that he was going to follow | Duncan initiated an IAB complaint against Lt. Leone. Her | The statements specifically referenced in the 12/11/97 IAB |

| No. | District | Allegation | Testimony | IAB | Comment |
|---|---|---|---|---|---|
| | | Chiefs to see if he could catch them in a compromising position." | us [Sanchez, Leary or Michaud] and try to catch us coming out of each other's homes. That was when I was in District 4." <br><br>Rumors about her and Michaud were called Cindygate. | issues with him were that he was spreading rumors about her and Michaud, Leary and Sanchez, his use of the Cindygate term, his saying that he was going to drive by her house to catch her with one of the chiefs, and his telling Sandoval not to let her come to District 4. (Nos. 39, 42, & 43).<br><br>IAB investigated and found no corroboration for statements contained in Duncan's complaint. The complaint against Leone was determined "Unfounded." (12/11/97 IAB letter, City's Exhibit G.)<br><br>Duncan is not aware of any further rumors spread by Leone. | letter include rumors about Duncan, "Cindy-gate." Leone's alleged statement that he was going to drive by her residence and that Joe Duncan had observed Leone doing so, and rumors of her walking out of Sanchez's house following the arrest of a sexual assault suspect. They are not evidence of gender hostility toward the plaintiff. |
| 43 | District Four (1996–2000) | "Lt. Leone was seen by Duncan's husband cruising slowly by their home." | There is reference made to District 4.<br><br>Joe Duncan testified: He does not know what Leone looks like. "I saw somebody that fit his description drive by my house" once. | See IAB complaint against Leone referenced in No. 42. | Same comment as No. 42. |
| 44 | District Four (1996–2000) | "Lt. —— repeatedly use the term 'woolies' to describe female genitalia during a conversation with Duncan in his office." | While explaining about handling internal affairs complaints, "Lt. —— starts telling me about woolies." He repeated it at least 12 times and was talking about a woman's genital area.<br><br>Duncan's testimony about the lieutenant is made in the context of Duncan explaining to another lieutenant why she would not complain about a sergeant's actions of walking out on her role call, talking down to her in front of people, etc. "I'm going to go and tell [the lieutenant] about subtle things that this man obviously would never understand?" | Duncan complained and IAB investigated the lieutenant's February 1997 actions. He was given a written reprimand and ordered to attend a Remedial Sexual Harassment Class. (6/4/97 IAB letter, City's Exhibit F.) The lieutenant was also transferred.<br><br>Duncan never worked with or had any interac- | The complaint resulted in reasonable remedial action. |

| | | | | | tions with this lieutenant again. |
|---|---|---|---|---|---|
| 45 | District Four (1996–2000) | "Lt. —— confronted Duncan during the pendency of an internal affairs investigation into the 'woolies' comments and accused her of stabbing him in the back." | The lieutenant asked Duncan to come into his office and "... I felt very badly because I actually did like [this lieutenant], and I felt bad how all this thing went down...." He asked her "Why did you do this?" "I liked you." "I thought you were an excellent sergeant...." "Why would you stab me in the back?"<br><br>She said, among other things, "I didn't know it was going to all end up this way. Originally, it was because of Sgt. ——, I said, and it just turned out this way, and that's all I can tell you." | This was part of IAB investigation and disciplinary action. (See No. 44.) | This cannot be considered hostile or offensive conduct. |
| 46 | District Four (1996–2000) | "Over a two-year period from 1997 through 1998, Sgt. —— regularly discussed Duncan's sex life and speculated about her various partners in a public restaurant in front of other command officers, including sergeants and lieutenants, and within earshot of other restaurant patrons." | Pre-disciplinary meeting transcript: The transcript provides that disciplinary action was recommended "based upon the following information and this is not intended to be a complete summary of the case file; For a period of time between January of 1997 and April of 1998, Sergeant —— patronized the Breakfast King Restaurant.... Over this period ... he engaged in several conversations with Mr. ——, the night shift manager, as well as fellow District Four sergeants. These discussions focused on Sergeant Cynthia Duncan and included a number of specific sexual references as well as ... adverse comments on her job capabilities.... [S]ome of these conversations were heard by other restaurant patrons and employees."<br><br>According to the transcript, the sergeant admitted his conduct was reprehensible, disgusting, mean-spirited, and immature. | IAB investigation and the sergeant was disciplined with a suspension of 60 days and ordered to attend Remedial Training on Sexual Harassment issues. (City's Exhibits H, I & J; plaintiff's Exhibit 9.)<br><br>Other than a letter the sergeant's lawyers wrote to the mayor about Duncan, since April 1998, she is not aware of any statements he made about her. The sergeant was transferred to District 2 in April 1998. | Appropriate remedial action was taken. |
| 47 | District Four (1996–2000) | "Sgt. —— criticized her abilities as a command officer to both fellow sergeants and at least one civilian." | This is part of No. 46 and references the same transcript. | This was investigated and the sergeant was disciplined. (See No. 46.) | See No. 46. |
| 48 | District Four (1996–2000) | "Sgt. —— was disrespectful and undermined Duncan's authority, walked out of roll calls she was conducting." | The initial complaint she made about him was more about him being rude, discourteous and condescending as opposed to comments of a sexual nature. | Duncan testified that she complained about his rude and discourteous behavior as well as his comments of a | See Nos. 46 & 47. |

| # | Location (Date) | Allegation | Description | Investigation | Conclusion |
|---|---|---|---|---|---|
| | | | The second complaint against this sergeant was "when all the sexual things occurred." His remarks got worse after he was transferred back to the morning shift; his remarks did not become the focus of the complaint until the second complaint. | sexual nature. Presumably this was part of the investigation referenced in No. 46 & No. 47. | |
| 49 | District Four (1996–2000) | "A lieutenant in AIB initiated a complaint against Duncan after Duncan asked that he be removed from the [sergeant's] investigation because he had been rude and disrespectful." | The referenced deposition testimony is not included in the plaintiff's exhibits. | | Date unknown. Even assuming this allegation is true, this conduct does not establish discrimination against Duncan based on her sex. |
| 50 | District Four (1996–2000) | "Ostracized by fellow sergeants who wanted to get along with —— because he was the senior sergeant on the detail." | Two named sergeants "wouldn't sit with me or anything when —— came back to the morning shift and I was on Detail 4. They wouldn't sit with me, but then when he wasn't working on a day off, they would come and sit with me." | No indication this was reported. | This is a consequence of the conduct of the sergeant who was appropriately disciplined. (See Nos. 46–48.) |
| 51 | District Four (1996–2000) | "In June 1999, a subordinate officer, [man], made a crude remark to Duncan while both were on duty, implying Duncan slept around." | During a discussion about how many points they got in their ratings, the officer commented: "when I [Duncan] said I have gone everywhere and done everything [but had a 5.2 rating], he said, Yes, that is what I heard. And he started laughing." | Duncan initiated IAB complaint against this officer. They both received written reprimands. | No date given but this occurred during a Rockies game they were working. This is an isolated random comment. |
| 52 | District Four (1996–2000) | "When Duncan filed an internal affairs complaint against Officer ——, she too was disciplined for using a cuss word in response to [his] improper comment." | Duncan said: "Make no mistake, I said, if you say one more thing and I will fucking file on you" and raised her index finger. She could not believe she might be filed on for losing her temper. She got a written reprimand for using profanity and he got a reprimand for what they considered to be inappropriate innuendo. | This was investigated and both received reprimands. See No. 51. | This discipline was not gender motivated. |
| 53 | District Four (1996–2000) | "Magazine article left in Duncan's interoffice mailbox with a cartoon of a naked woman in a bathtub and subheadings in the article such as 'Orgasms That Don't Cause Flood Damage' and 'Breasts that Work'." | Testimony supports statement. Plaintiff's Exhibit 12 is article: "9 reasons why men envy you." It is contained in a *Glamour* magazine, written by a man and states "Men are Jealous of Women." The subheadings cited by Duncan are just two of them, but they were the ones Duncan testified that she found offensive. Other headlines include "Pasta Therapy," "Great Bathroom | IAB investigated statement made by Lt. Bown, when he was shown the article by Duncan. Bown said it was not a "female thing" but a "Cindy Duncan thing." Lt. Bown reported the incident and he was exonerated. | No date given, but the article appears in the June 1998 *Glamour* magazine. It could not reasonably be considered hostile and abusive to women. |

| | | | | |
|---|---|---|---|---|
| | | "Escapes," "Makeup Magic," "Cheerleading squads," "Public displays of expression," and "More life choices." <br><br> Briefly summarized, the article is about "[t]he female habits, pleasures and treasures that men secretly covet." | (10/7/98 IAB letter referencing 7/98 incident, City's Exhibit L.) | |
| 54 | District Four (1996–2000) | "Duncan's work was undermined, paperwork was removed from her desk, her application for the lieutenant's exam, which had been left in a patrol car, was removed from the car and found in Lakewood by a citizen." | Duncan had her papers—her "job history"—in a notebook and showed it to some sergeants who had not taken the test and were curious about the process. "Somebody got in my car and threw my job history, which was the only copy I had, and threw it into Lakewood." A Lakewood man found them. <br><br> No supporting testimony was provided in the cited pages for her allegation that her work was undermined or that paperwork was removed from her desk. | No testimony that this was reported. | Although no date was given, she testified, in the referenced pages, that she took the test "[m]aybe two years ago," which would have been about November 1997. It is undue speculation that this action was done by a male police officer or that it was gender motivated. |
| 55 | District Four (1996–2000) | "Accusations that she was having affairs with Chief Michaud, Dep. Chief Sanchez and Dep. Chief Leary with the situation being dubbed 'Cindygate'." | The same testimony of Hines that was used to support No. 38 is used to support allegation No. 55. Hines testified that comments about Duncan were referred to as "Cindygate," and there were "different things" about Duncan's relationship with the chief and handling of a sex assault in front of the chief's home. | In January 1996, Duncan initiated an IAB complaint about rumors, alleging Detective Anne Woods initiated them. IAB investigated, determined that rumor resulted from a conversation between Woods and Duncan, and found the case "Not Sustained." (3/28/96 letter, plaintiff's Exhibit 17; 3/19/96 IAB letter, City's Exhibit E.) | No date given but refers to the reason for Duncan's transfer to District 4 out of IAB. |
| | | | Duncan testified: Cindygate was about her and Michaud, Sanchez, and Leary. "I was told that it was about Leon[e] saying that he was going to topple this administration with the information he has and he said, And my information I've entitled Cindygate. And he was implying that I was having sex with all three chiefs." "Apparently Leon[e] dubbed it Cindygate." | Duncan is unaware of any further rumors being circulated thereafter by Woods. <br><br> Leone was investigated. (See No. 42.) | No date given. <br><br> Duncan's testimony establishes the rumors are gender neutral. They were directed at "toppling" the administration and not to her based on her gender. |
| 56 | District Four (1996–2000) | "Chief Michaud went to roll call at District 6, said he | *Sanchez testified:* Cindygate "was the word that described the fact that Chief Michaud's | Duncan initiated a complaint about rumors | No date given. <br><br> This is the same |

| | | | | | |
|---|---|---|---|---|---|
| | | was there to dispel rumors and announced that, 'he was not having an affair with Cindy Duncan'." | administration was going to fall because of this Cindygate thing, because of this sexual liaison." | and IAB conducted an investigation. (See No. 55.) Leone was also investigated. (See No. 42.) | subject matter as No. 55. Michaud's conduct could not reasonably be considered anything other than an effort to stop the rumors. |
| | | | There were rumors that Michaud was involved with Duncan, living outside the city and getting a divorce all going on at the same time. "He [Michaud] felt that this rumor situation was out of control, and he wanted to stop it. He felt that if he went to some of the roll calls in District 6 [the largest district] . . . that he, maybe, could nip this and make it go away." | | |
| | | | Michaud told Sanchez that Michaud was going to try and dispel "each of these rumors . . . the divorce, living out of the city, Cindygate, that sort of thing." Michaud told Sanchez "he discussed all of these issues with the officers at roll call," including telling the officers he was not having an affair with Duncan. | | |
| | | | *Coogan testified:* Michaud told her he went to a roll call and announced he was not having an affair with Duncan. He indicated Leone was connected to the term Cindygate. | | No date given. |
| 57 | District Four (1996–2000) | "On two occasions when Duncan was covering dangerous calls, she requested cover and failed to get it until dispatch assigned a cover car." | When Duncan was a sergeant about '98, there were two examples of when she did not get cover. One involved a fight between two men and a woman. She called for cover, did not get cover until she called again and "they ordered somebody to get there." The other time was when she went to a domestic and her cover did not come for 15 minutes. | No indication this was reported. | It is highly speculative that this was gender motivated. |
| 58 | District Four (1996–2000) | "Duncan was transferred to the Police Academy against her wishes to a nonsergeant position." | Heather Coogan "offered me to go to the academy." I did not want to go, it was an hour away from my house, winter was coming and I had a sports car, I only have five minutes to District 4. I never wanted to go there.

She left the academy to go to traffic because: she had a non-sergeant position at the academy, the only vacant position available was a technician spot. "But due to the circumstances, they sent me out there [academy]." When | No indication this was reported. | No date given but on pages 2–3 of her Response brief, Duncan states, without supporting reference, that she was transferred to the Police Academy in August 1999, assigned to the photo radar unit in traffic in December 1999, and went on medical leave in |

the photo radar program came in they had to put a sergeant in there, "I was the only sergeant in a non-sergeant position," Dep. Chief Abrams called me, said I did not have to go there, but he would appreciate me taking on the program. "So that is what I did."

She went on medical leave from traffic. The reason was because: "there was an incident when I was working a Rockies game...."

June 2000.

There is no evidence to support Duncan's perception that this was an adverse action.